**WESTMAN COMMISSION COMPANY, a Colorado Corporation,**

v.

**HOBART CORPORATION, an Ohio Corporation.**

Civ. A. No. 76–K–918.

United States District Court,
D. Colorado.

Dec. 6, 1978.

As Amended Dec. 7 and 8, 1978.

Roger Goldburg and Sidney W. Delong, Shank, Irwin & Holmes, Denver, Colo., and Michael J. Abramovitz, Drexler & Wald, Denver, Colo., for Westman Com'n Co.

James E. Hautzinger, Dawson, Nagel, Sherman & Howard, Denver, Colo., and John F. McClatchey and Thomas J. Collin, Thompson, Hine & Flory, Cleveland, Ohio, for Hobart Corp.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

Pursuant to the pre-trial order of May 9, 1978 trial of the above captioned case was bifurcated. The first trial which began August 21, 1978 is limited to the determination of liability. The second trial which has yet to be set will be to determine damages. Following the August trial a transcript of proceedings was prepared and extensive post-trial briefs were filed. I have now completed an examination of the record, exhibits and briefs and will commence the onerous task of making these findings of fact and conclusions of law. The job has been made easier by the excellent quality of advocacy demonstrated by counsel for both

---

the plaintiff and the defendant. The presentation of the evidence and arguments will provide me with no excuse for error and thus I approach this decision with unaccustomed diffidence. As previously implied, my conclusion is that the plaintiff has established liability by a preponderance of the evidence and that a subsequent trial on the issue of damages will be required.

The plaintiff, Westman Commission initiated this private antitrust action against the defendant Hobart Corporation alleging that the defendant combined or conspired with a competitor of plaintiffs, Nobel, Incorporated, to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. Specifically, Westman alleges that Hobart conspired with Nobel in Hobart's refusal to appoint plaintiff as a dealer in Hobart kitchen equipment for the purpose of excluding plaintiff from competing with Nobel in the Denver market for the sale of restaurant equipment and supplies.

There is a recognized distinct market wherein a purveyor can supply a customer in the institutional food service or restaurant business with all requisite equipment and supplies. Commonly referred to as "one-stop shopping" or "full-line distribution," customers obtain convenience, cost savings and better service from a "one-stop shopping" distributor than from houses specializing in selected products.

Westman is presently engaged in the restaurant equipment and supply business. From 1952 to 1973 Westman was in the wholesale grocery business, supplying frozen foods, dry groceries, paper products and janitorial supplies to retail grocers, restaurants, hospitals, schools and other buyers. In 1973, Westman purchased the assets of the WE–4 Division of Wilscam Enterprises, Inc., in order to expand the scope of the business to that of a "one-stop shopping" center for institutional and restaurant customers. The WE–4 Division supplied all of the furnishings and kitchen equipment for Wilscam Enterprises' restaurants as well as a number of other customers which were not part of the same corporate monolith.

Hobart is a manufacturer of kitchen equipment for use in food service establishments where food is prepared for consumption either on or off the premises. The products it manufactures include scales, reach-in and walk-in refrigerators and freezers, certain types of cooking and reheating equipment, food mixers, slicers and cutters, dishwashing machines, disposers, and waste equipment systems.

Often, and sometimes proudly, referred to as the "Cadillac" of the food service industry, Hobart has enjoyed the reputation of being the preeminent manufacturer of kitchen equipment. Thomas Ricca, an expert in food facilities design, testified that in certain lines of restaurant equipment there is a noticeable absence of acceptable substitutes at a price comparable with that of Hobart products. He further stated that Hobart's food preparation equipment, table food cutters and microwave ovens are superior to anything else on the market.

In addition, Mr. Ricca testified that Hobart is the only manufacturer to offer factory service of its equipment. Although service is normally available for the products of other manufacturers who compete with Hobart, such is usually provided by a factory trained service representative as distinguished from a manufacturer's own service company such as Hobart.

Mr. Ricca could not recall any specification among hundreds that he had prepared in which some Hobart equipment was not included. He noted that a customer generally requires a dealer to bid the primary item as specified and then, if desired, to submit an alternate or substitution at the end of the bid as an addendum. Ricca was careful to emphasize, however, that alternates or substitutes are rarely accepted and that many bids are awarded on an all or none, take me as I am or leave me be, basis.

Hobart sells its commercial kitchen equipment through its Food Service Dealer Division to approximately 540 independent dealers located throughout the country. There are presently between 1,500 and 1,600 restaurant equipment dealers in the United States. It is not known how many of these

fall within the "one-stop shopping" category. Where a formal dealer sales arrangement has been executed by Hobart, a dealer can purchase directly from Hobart at factory prices and also obtain rebates of up to eight per cent of its purchases at the end of the year. In a business as competitive as the restaurant equipment and supply business, this eight per cent rebate is taken into account when preparing bids on particular jobs.

Considering the range of Hobart products, their superior quality, the competitive prices, the absence of alternates or substitutes for several of Hobart's products, the factory service available, and the difficulty in maintaining a competitive posture in the market in the absence of receiving the year-end eight per cent rebate, it is manifest that a Hobart dealership is essential to a successful "one-stop shopping" operation.

Presently, and at the time of the alleged combination or conspiracy, Nobel is a dealer in Hobart kitchen equipment. Nobel is a "one-stop shopping" center of institutional food products, frozen foods, frozen fish and meat, janitorial products, restaurant equipment and supplies.[1] It is of critical importance to note that as of 1976, the Denver area [which according to Hobart jargon includes Pueblo, Colorado some 120 miles distant] had eight Hobart dealers. As of December 1977, in the same area there were five Hobart dealers. In both years and for at least three years prior Nobel was the highest dollar Hobart dealer accounting in each year for shipments totaling approximately between forty and fifty per cent of the dollar volume of Hobart dealers in the designated area. During all this time Nobel was the only designated Hobart dealer engaged in a "one-stop shopping" operation. [See Joint Exhibit 85 M.] Since it is manifest that a Hobart dealership is essential to a "one-stop shopping" operation and Nobel was the only "one-stop shopping" operation in the "Denver area," it is equally manifest that if Nobel's position was not entirely

monopolistic, it certainly was enviable. This position alone provides more than ample motivation for Nobel to importune Hobart to refuse to give Westman the quintessential dealership.

The WE–4 Division was purchased by Westman on June 15, 1973. Although Hobart had been accepting orders from the WE–4 Division as if it were a formal Hobart dealer, a sales agreement form had never been signed by Wilscam Enterprises. When Hobart learned of Westman's acquisition of the WE–4 Division, Robert F. Knight, vice president of sales for the Food Service Dealer Division of Hobart, decided not to execute a sales agreement with Westman until he could determine what the programs and aims of the new firm were. Mr. Knight testified, however, that *in most cases* the acquiring firm of the Hobart dealership is also extended a dealership. Compelling reasons, which were not defined, sometimes require a contrary result.

Thomas E. Wilscam, a major shareholder in Wilscam Enterprises, testified that the principal subject of the sale of WE–4 Division to Westman was the product lines that WE–4 had established. Westman also acquired WE–4's inventory, showroom, and a few of its sales people. Wilscam stated that he had contacted all of the suppliers that he had been dealing with through WE–4 Division and each had indicated agreement, without guaranties, to continue to sell products to Westman as long as Westman did a job comparable to that done by WE–4. Wilscam also testified that in response to his inquiry, he had been told by Hobart that if Westman continued to do the *same* job that WE–4 had done, Hobart would have no problem in extending a dealership to Westman. WE–4 was primarily an in-house dealership. As such, it was not a threat to Nobel. The sale to Westman, however, completely changed the picture. Westman would no longer continue to do the same job that WE–4 had done. Rather,

---

1. Prior to June of 1973 Nobel was the only "one-stop shopping" center in the Denver area. Accepting the testimony of Mr. Ricca that (1) there are few specifications which do not have

some Hobart equipment included, and (2) alternates or substitutes are rarely accepted, then, by definition, Nobel remains the only "one-stop shopping" concern in the Denver area.

by reason of its acquisition of the Hobart dealership, Westman would be able to compete with Nobel and Hobart would, as it did, have a problem in extending a dealership to Westman.

Although no formal dealership agreement was extended by Hobart, sales were made to Westman on a "casual" basis over the following 14 months. For all intents and purposes, everything appeared to be copacetic and there was little or no question in the minds of the people at Westman that a formal dealership arrangement would be forthcoming.

In May 1974 Mr. Knight, of Hobart, met Mr. Weil, President of Westman, at the National Restaurant Show in Chicago, Illinois. At that time they discussed the rebate owing to Westman which had accrued after June 15, 1973 and also went over in detail the corporate and business concept of Westman Commission Company and its desire to become a "one-stop shopping" center. Mr. Weil related his desire to do "a lot" of business with Hobart; advised that Westman was dedicated to its suppliers; and promised that Westman would do everything it could to become a good Hobart dealer. Again, Weil made it known that he wanted a *formal dealership agreement.*

The procedure for becoming a Hobart dealer is quite formal. According to Mr. Knight, a potential dealer inquires of Hobart either directly in Troy, Ohio or to a local office. Significantly, there is a paucity of evidence in the record to indicate that Hobart ever seeks new dealers. If the request comes to the home office, the inquiry is directed to the district representative or manager, whose disapproval is authoritative, but whose approval requires confirmation.

There is a network of approximately 105 people who make up the field sales force in Hobart's Food Service Dealer Division. There are 6 regions, each of which has a regional manager; 26 districts, each of which has a district manager; and 76 territories within the 26 districts, each of which has a district representative. District rep-

resentatives and district managers have the same job responsibilities in the field except that the district manager is in charge of an area in which more than one territory is located. Regional managers have no specific dealer or quota assignments; they administer the sales programs in the field. A district representative reports to a district manager; a district manager reports to a regional manager; and a regional manager reports to the director of sales for Hobart in Troy, Ohio. Dick Jones is the director of sales involved in this matter. However, with respect to matters involving Hobart-dealer relations, regional managers report directly to Knight.

The process by which Hobart appoints a new dealer begins with a recommendation from the district representative to his district manager. A recommendation must then be made by the district manager to his regional manager followed by a recommendation by the regional manager to Mr. Knight in Troy, Ohio. No dealer would be appointed unless Mr. Knight receives the affirmative recommendation of both the district manager and the regional manager.

The Hobart people with whom Westman was corresponding in its efforts to become a Hobart dealer were William A. McKinley, district manager of the Hobart Dealer Division in Colorado, Robert Bannon, regional sales manager of the Food Service Dealer Division, Southwest Region, and Robert F. Knight, vice president of sales, Food Service Dealer Division, Troy, Ohio.

Bannon testified that he would evaluate the district manager's recommendation before making any further recommendations to Knight. He noted that the regional manager rarely gives a negative recommendation where the recommendation of the district manager has been positive. Specifically, he stated, "We generally accept the district manager's evaluation of the marketplace that he's in. Normally the procedure is positive until something develops to prove it otherwise."

In a letter, dated May 23, 1974, Mr. Knight informed Westman that Hobart would not issue a sales agreement at that

time but indicated that he was requesting either Mr. McKinley or Mr. Martin Rust, past district manager in Colorado, to contact Westman in order to determine if there was a mutual interest in the two companies working together. William A. McKinley came to Colorado in May, 1974.

On July 22, 1974 Westman placed an order with Hobart for an AM–11 dishwasher for a Denver Public School bid. The Denver Public Schools was one of Westman's largest customers and Westman was the successful bidder on this job. Nobel had also bid on the job but was obviously unsuccessful in securing the same.

In a letter to Bannon, dated July 26, 1974, McKinley attached Westman's order for the AM–11 dishwasher, indicating that he would not recommend signing Westman as a Hobart dealer at this time. This letter was followed by a letter from Bannon to Westman, dated August 2, 1974, in which Bannon indicated he found it necessary to return the order for the AM–11 dishwasher since Westman had no dealer sales arrangement with Hobart. He also opined that perhaps Hobart could extend a sales arrangement at some future date depending upon whether some agreement compatible to both companies could be worked out with McKinley.

McKinley testified at trial that Hobart had a formal practice of returning any orders that were received in Troy from those who were not Hobart dealers. Claiming that he did not know that Westman had been doing business with Hobart since June of 1973, he stated that he was not aware of any other time prior to the return of the AM–11 dishwasher order where an order from Westman had been returned.

In his memo to Bannon, dated July 26, 1974, he stated that Westman had been sending orders, some of which had been acknowledged, yet he claimed that he did not know that Hobart had been doing business with Westman. McKinley testified that he wrote this memo asking Hobart not to handle any orders from Westman even though, prior to this time, he had not been to see Westman's facilities; had not investi-gated Westman's financial condition; and had not met any of the principals at Westman. It is important to note that McKinley believed that he "had no loyalty from any dealer," yet, he was prepared at this point, without any investigation, to resolve that Westman should not be signed on as a dealer.

In what has to be considered a *tour de force* in the art of tergiversation, Harley R. Turnbeaugh, manager of the Contract Design Department of Nobel since 1970, testified that when McKinley first came to the territory he had a meeting with him once each week for several months. The two visited socially as well. When asked whether he had ever discussed Hobart's business relationship with Westman, he stated that he couldn't remember. He stated that he had suggested to McKinley that "a select group of dealers might be a smart way for him to go." Turnbeaugh testified that some people could have interpreted his statement to mean that if Hobart did business with Westman it could jeopardize the relationship between Nobel and Hobart, but he didn't think the word "jeopardy came up." Maybe the word didn't, but, as we shall see later, the idea did. Although he did not recall a promise on the part of McKinley that Hobart would not sell to Westman, Turnbeaugh testified that McKinley had stated that Hobart would not appoint Westman as a dealer. Semantic obfuscation aside, the evidence and credibility of the witnesses convince me that if the agreement to refuse to deal with Westman was not expressly stated, it was certainly tacit. Turnbeaugh knew the meaning of what he heard and McKinley knew the import of what he was saying—Westman would not be made a dealer. In fact, McKinley testified that the letter returning the order for the AM–11 dishwasher had nothing to do with the ability of Westman Commission Company to promote Hobart products. McKinley's letter to Bannon utilized language which went beyond that of a mere recommendation. In part, that letter states as follows:

I have asked Hobart not to handle any orders from this [Westman] Company. . . . Attached is an order for an AM–11 Dishwasher, I would like to return to them letting them know at this time we cannot sign them as a Hobart Dealer. I do not know whether it should be my responsibility or Hobart's to write this letter letting them know that at this time we cannot sign them as a dealer, and return this purchase order.

On August 2, 1974, Bannon wrote a letter to Pat Armstrong at Westman returning the purchase order for the AM–11 dishwasher, stating "I find [it] necessary to return (enclosed) [this order] as we have no dealer sales arrangement at this time with your company and the Hobart Corporation. . . . Hobart has always followed a course of selective distribution and we are satisfied with the dealer coverage that we currently have in the Denver trade area." At this juncture McKinley ·felt that this territory was fraught with problems. When he arrived, he questioned existing dealer loyalty. Less than a year later he accepted an order from Westman "on a casual basis" because "he needed the business."

McKinley testified that he had no experience with respect to the dealership organization in this territory when he arrived here. He was replacing Martin Rust as district manager, yet he denies ever having discussed the operations of the territory with Rust. McKinley testified, "I have a habit of trying to find out the problems on my own and not be influenced by another person." McKinley had been in the sales division since 1966, yet, he made the judgment that it was not appropriate to discuss problems in the district with Rust. It is a difficult bite to swallow since he admitted that he had met with Rust each day.

On August 21, 1974 a meeting was held between Hobart representatives, McKinley and Rust, and Westman representatives, Armstrong, McLaren and Weil. The meeting was held at Westman Commission Company. McKinley testified that he had no private conversations with Rust prior to the meeting concerning Westman or what was to transpire at the meeting. On the one hand McKinley testified that "Westman was something I was very unfamiliar with as far as people, and it's hard for me to visualize what a company is without knowing who the people are; and I do not like to badmouth . . . someone before I have an opportunity to meet them." On the other hand, in a memo addressing "Key points discussed during the September 12, 1974 meeting with Bob Bannon, Dick Jones and myself" he wrote: "August 21, 1974, met with Westman Commission Company, Mr. Bob Weil, Mr. Pat Armstrong, Mr. McLaren, along with Rust. In this meeting I felt Rust was not backing me, even though I had told Rust I did not want Westman as a dealer. . . ." Three very important grains should be gleaned from this memo: (1) he had discussed the possibility of Westman becoming a Hobart dealer with Rust prior to this meeting; (2) he "did not want Westman as a dealer;" and (3) Rust did not support him. On July 26, 1974 McKinley had already recommended that Westman not be made a dealer.

At the August 21 meeting, Weil took McKinley on a tour of Westman's facilities, described its existing business to him and demonstrated the company's capabilities. McKinley acknowledged that Rust supported Westman's efforts to become a Hobart dealer and, though piqued, recognized that Rust had expressed this support during the meeting.

On August 27, 1974, Bannon wrote a memo to Knight which set forth the basis for his recommendation that Westman not be made ·a Hobart dealer. The memo, in part, reads as follows:

Other than the fact that they actively promote Stero, and have for years, they lost the two key salesmen at the time that they acquired Wilscam; namely, Lanny Dick and Roy Van Dyke. In addition, they anticipate annual sales of twenty million including groceries, equipment, and soft goods, *competing directly with Nobel Incorporated. As a matter of fact,*

*Harvey Turnbeaugh and Jim Richardson have commented to Bill that if Westman Commission Company were given a sales arrangement, it would definitely affect our sales volume with them.* (Emphasis added.)

At trial Knight testified that a dealer's performance can usually be determined by the people that are in the organization. Specifically, he stated that "if we don't have knowledgeable, trained field people that know what they're doing, that very definitely affects our thinking as it relates to the appointment of a new dealer."

At the time that the decision was made by McKinley not to make Westman a dealer, Westman had two experienced salesmen working for it: Pat Armstrong had worked for Nobel for 2½ years prior to coming to work for Westman and Duncan McLaren, who had extensive background in the restaurant equipment business working for Hobart dealers.

On August 30, 1974, McKinley wrote a memo to Bannon in an attempt to confirm in writing why he was recommending against making Westman Commission Company a Hobart dealer. His reasons included an impression that the volume of sales through August 1974 indicated to him that even as a dealer, Westman was not capable of giving Hobart the amount of business it might require from minimum dealers; that Westman would use Hobart products only when forced to do so [this referred to a sale to the Petroleum Club which was supplied with a Stero Circulator machine in early 1974 when it is asserted, Westman thought it was a Hobart dealer]; and that *"Jim Richardson and Harley Turnbeaugh from Nobel have both indicated that should Westman be made a dealer this would greatly jeopardize our business with Nobel."* (Emphasis added.)

Bannon testified that the most important factor in his mind in determining whether to recommend an applicant for a dealership is "are we going to have a mutual relationship; is a dealer going to support the sale of our products, and certainly if that be the case, then we have a great sales organiza-

tion to, in turn, support him in the sale of our products. But at that point in time we did not feel that we would enjoy the support of Westman Commission Company in the sale of Hobart products, period." Bannon then indicated that he based this conclusion on reports received from the Denver district manager as to Westman's conduct, i. e., William McKinley.

It is also important to note that in this August 30 memo from McKinley to Bannon, McKinley stated, "I have asked Martin Rust why he did not put them on as a dealer and to this date have not received an answer from Martin." Yet McKinley testified that he hadn't discussed Westman with Rust prior to the August 21, 1974 meeting and that he in fact had not discussed problems in the territory with Rust at all since he "had a habit of trying to find out the problems on [his] own and not be influenced by another person." In addition, at the August 21, 1974 meeting it was only too apparent that Rust advocated Westman being made a dealer.

Knight's reaction to the August 27, 1974 letter from Bannon was adverse. He testified that he telephoned Bannon and told him that he was "disturbed" and "concerned" about the letter and the situation with Westman. His request that Bannon go to Denver and talk with Westman was based upon his impression that the "situation apparently [was] not being dealt with in the manner that it ought to be, and it [required Bannon's] input at this time."

On September 11, 1974, Bannon and McKinley met with Westman's Weil and Armstrong. At this meeting Bannon agreed to accept the order for the AM-11 dishwasher and advised that Hobart would give Westman 30 days to finalize doing business on any bids or jobs that Westman had pending. Armstrong testified that no mention was made at this or any other meeting of any test period for Westman during which Westman had to demonstrate its ability to sell Hobart products.

A hiatus in correspondence between these two companies was closed in May of 1975 when Westman personnel met with the Ho-

bart people again at the National Restaurant Show in Chicago. At that time Knight indicated he would be coming to Denver in July and that an arrangement would be worked out so that Westman could become a Hobart dealer. No one from Hobart, including Knight, made such a July visit.

A meeting was held in late spring or early summer of 1975, by McKinley with Armstrong and Ted Stockin. (Stockin had been hired by Westman in March, 1975; he is an experienced salesman in restaurant equipment who had been with a Hobart dealer, Green Bros., for four years.) McKinley was advised that Westman had just sold a dishwashing system to the Sign of the Dove restaurant and had several public money jobs amounting to approximately $40,000 worth of Hobart equipment.

McKinley related to Armstrong that McKinley *needed the sales* and that he wanted Westman to work out something so that he could actually furnish the Hobart merchandise. He suggested to Armstrong that Westman bootleg the merchandise through one of his other dealers.

There is a general concensus, however, that there was no way that Westman could bootleg Hobart from another Hobart dealer and still be competitive. The president of Westman testified, "Nobel is our primary competitor; and if we can't buy at the same price as Nobel, there's no way we can compete with them." The inability to get the eight per cent rebate affected the amount that an equipment dealer could bid. Furthermore, if Westman was to buy from an existing Hobart dealer, it had to pay that dealer an upcharge for supplying it with the equipment. Under these circumstances and in a market as competitive as the equipment supply business, McKinley's suggestion that Westman bootleg Hobart's products was totally unrealistic.

Upon Westman's offer to give Hobart an order for merchandise to put in stock, McKinley agreed to accept the orders on a "casual basis." He suggested that the details of a dealership could be worked out and that it was just a matter of time before Westman would become a dealer. McKin-

ley advised that at the time Westman actually became a dealer the eight per cent rebate would be retroactive to include the orders it was submitting at that time.

In a memo dated July 23, 1975 McKinley advised Bannon that he wanted to handle Westman on a "casual basis" for the interim of 1975 "unless such time their volume should become so great that we would have no other choice but to sign them." He indicated that he was willing to accept this arrangement because he "need[ed] the business." Poignantly, the next sentence in the memorandum says, "I am still feeling my way with Nobel."

The phrase "no other choice" has a significantly deflating effect on McKinley's pious assertion of Hobart's desire to do business with Westman. The balance of the memo indicates that McKinley clearly had Nobel in mind at the time and that he had serious apprehensions about Nobel's continued position as the foremost Hobart dealer in the Denver area.

In this memo, McKinley also indicated to Bannon that he had informed Stockin that Hobart was not sure of Westman's loyalty; that until Westman proved its desire to push Hobart products, a decision could not be made on the present orders; and that Westman had to show interest in Hobart over and above bidding Hobart specified items.

The foregoing requires some elucidation. There are two general categories of sales opportunities for equipment dealers: a. Bid jobs—where the owner specifies a particular brand of kitchen equipment, and b. Negotiated jobs—where the dealer has the opportunity to promote a particular manufacturer's product. McKinley contended that Westman's promotion of Hobart's products was insufficient in the latter category.

Subsequent to the determination, McKinley received a letter from Ted Stockin, dated July 30, 1975, wherein Westman was forwarding purchase orders to Hobart totaling over $39,000. Stockin indicated, "It is hoped that this is an illustration of our firm's desire to work with you as a Hobart

dealer." In this letter Stockin also expressed the desire to have Hobart corporation represented 'in Westman's catalog and test kitchen. The test kitchen was equipped for display purposes as well as for testing equipment under normal restaurant cooking conditions. It took Westman approximately 12 weeks to do $40,000 worth of business in Hobart equipment. Further, Stockin requested that McKinley attend Westman's monthly sales meetings so that he could assist Westman's personnel in getting Hobart products "out on the streets."

In late September of 1975 Hobart representatives once again met with Weil and Armstrong at the National Association of Manufacturers Representatives Convention [NAFEM] in Louisville, Kentucky. Accompanying Knight and Bannon at the convention was Mr. Condron of the Finance Department, Hobart Corporation. Weil took this opportunity to give Hobart a copy of Westman's financial statement, advising that Westman had a net worth of over one million dollars. Weil testified that Condron assured. him Westman had no problem in securing a dealership with Hobart, especially since Westman had a good payment record and its financial stability was positive.

Despite the enthusiasm expressed by Stockin in his letter, and the determination and qualifications shown by Weil at the NAFEM Convention, in September of 1975 McKinley determined that Westman had failed its "test." He asserts that the $40,-000 worth of business during the three month period was a failure of loyalty since it was for bid business as distinguished from negotiated business and thus was a failure in terms of promotion. He attempts to justify this determination despite the fact that he had not inquired into Westman's performance prior to making this decision and did not even investigate what Westman had done following the receipt of Stockin's letter at the end of July. McKinley testified that he did not recall any phone calls or meetings with Westman during this two month period; that he didn't have any information regarding how Westman was doing; and that he didn't remember whether he even looked to see if West-man had submitted any purchase orders during that time period. Based on this farrago of reasoning he says he was prepared to reject Westman as a dealer in Hobart equipment for lack of loyalty. McKinley's credibility was decimated.

On September 24, 1975 McKinley telephoned Bannon at the NAFEM show. The following message was left for Bannon: "Was Westman in the booth at Louisville? Bill does not intend to sign them up as a dealer."

At a meeting in January of 1976, McKinley advised Westman that Hobart was not going to make Westman a dealer and was not going to sell to Westman at all. In spite of Weil's reiteration of the one-stop concept and Westman's dire need for Hobart products, McKinley could only suggest that Westman bootleg Hobart merchandise from another dealer.

Distilled to its essence the trial showed clearly that Westman was, in all respects, qualified to be a Hobart dealer; that Nobel was, and is, in a nonpareil marketing position as a "one-stop shopping" facility in the Denver region and that a Hobart dealership is essential to the successful operation of a "one-stop shopping" concern in the relevant market area. With equal or greater clarity the evidence showed that Nobel was, and is, Hobart's biggest customer in the Denver region and that McKinley, a new regional manager, did not want to do anything which in any way would jeopardize his relationship with his largest account. With the hot breath of Westman felt down its corporate back, there is hardly room for doubt that Nobel, through Turnbeaugh, pounced on the situation created by the replacement of Rust with McKinley with sufficient force to impress indelibly upon McKinley the notion that a transfer of the nascent WE–4 dealership to Westman would seriously jeopardize his biggest account. That Nobel would not want the competition is understandable. That Hobart would not want to lose any of Nobel's business is obvious. That, because of Westman's capacity the two would conspire to keep Westman from

becoming a successful "one-stop shopping" concern by denying it a Hobart dealership combines a unity of purpose with a common design and understanding which is illegal. The evidence fully supports the conclusion that Hobart engaged in a conspiracy in restraint of trade to the detriment of Westman and is therefore liable to Westman for damages. The totality of the evidence persuades me that Hobart's given reasons, not including its conspiracy with Nobel to refuse to deal with Westman, are pretextual.

Given the foregoing findings of fact, the applicable law does not require a great deal of discussion. Hobart's refusal to deal with Westman fulfilled the anti-competitive purpose of preventing Westman from obtaining Hobart equipment at a price comparable to that offered to other dealers. Given the prevalent market requirement for Hobart equipment, Westman was not only precluded from competing for Hobart sales but for other equipment as well. Thus, other manufacturers and dealers and purchasers were adversely affected by this conspiracy to restrain trade.

I am satisfied that the evidence shows a *per se* violation and that the tests set forth in *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), are more than met. As the previous detailing of facts suggests, I am convinced that an agreement between Nobel and Hobart to have Hobart refuse to deal with Westman existed. Primarily, Hobart is bound by the acts of its agent McKinley, but he did not act alone. He received Bannon's *imprimatur* and Knight's *nihil obstat*. This is not a case, as suggested by defendant, of a manufacturer merely choosing not to deal with a particular distributor or trader. Rather it is a case of a combination of a manufacturer and a competitor which is possessed of the pernicious purpose to exclude a competitor from the market by cutting off its source of supply. As stated in *United States v. General Mo-*

tors Corp., 384 U.S. 127, 146–147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), "Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing . . . '. .'" Irrespective of the niceties of case law distinctions, a conspiracy to exclude a competitor from the trade is, in and of itself, the substance which the Sherman Act is intended to prohibit. Its pernicious effect is not, in my view, subject to serious question.

If, however, the application of the *per se* rule seems too much akin to traveling in seven-league boats, I am equally convinced that an application of the rule of reason renders the same result.

Section 1 of the Sherman Act condemns all conspiracies in restraint of trade. Perhaps because the procrustean import of the plain meaning of the words of the statute was more than the sensibilities of the court could then bear, it was declared soon after enactment that only unreasonable restraints are proscribed. Thus, that which violates the rule of reason is determined to violate the Act. The rule of reason requires a complex determination of the effect of a given business arrangement or agreement on competition and the possible justifications of any adverse effects.

Some business agreements and arrangements have been held to be illegal *per se.* Thus, what would have been a violation of the plain meaning of the words of the statute has now become, through a rigorous and tedious exercise of the eristic arts so obviously violative that it is conclusively presumed to be unreasonable.[2]

Other business agreements and arrangements which restrain trade have been held to be redeemed by the acceptable reasons which are presented as the basis or motivation for the agreement. Thus, wholesome reasons are sometimes held to outweigh

---

**2.** A conclusive presumption means that if a fact is found which would negate the presumption, the fact may not be considered. The justi-

fication for permitting conclusive presumptions to intrude into the reasoning process has never been fully or even adequately explained.

peccadillos of restraint. Given the utter lack of credibility which can be attributed to McKinley's testimony, the reasons offered by the defendant for denying plaintiff the dealership are reflective rather than generative. Each, however, shall be considered.

Throughout 1974 and 1975, Hobart never once advised Westman that Hobart had any problem with Nobel. When confronted on more than one occasion with the accusation by Westman that Hobart was refusing to deal because of pressure from Nobel, McKinley stood in sphinxly silence. Now, however, the reasons offered are that Hobart had doubts about Westman's ability to pay for Hobart purchases. The reason is spurious. Westman provided Hobart with evidence of its good reputation for paying its accounts promptly and disclosed to Hobart its financial records showing a net worth of $1,000,000. Mr. Condron, of Hobart's finance department assured Weil that Westman would have no problem in securing a dealership with Hobart especially since Westman had a good payment record and its financial stability was positive.

Hobart also asserts that it did not choose to make Westman a dealer because it had adequate coverage in the area. The coverage was so adequate that McKinley asked Westman to bootleg Hobart purchases because he needed the sales. Further, Hobart was fully prepared to sign Wilscam's WE–4 as a dealer and indicated it had no objection to the transfer of WE–4 to Westman so long as Westman continued in the same way that Wilscam had. It was not, as asserted, that the area was adequately covered, but, rather, that the Hobart/Nobel arrangement was adequately protected.

Hobart next urges that its people doubted Westman's loyalty to the Hobart line. Given the enthusiastic support Westman enjoyed from Rust and the complete lacuna in McKinley's knowledge of Westman's personnel, ability, facility and opportunity, the proffered reason must be regarded as specious. Without the eight per cent rebate given to dealers, it is difficult to justify Hobart's proffered explanation that Westman had not demonstrated product loyalty. One is perplexed by the *ipse dixit* nature of this assertion. If one is not given the opportunity of having a dealer-manufacturer relationship, how is it possible to determine whether one is loyal to that relationship. It is not to be ignored that while Westman was selling approximately $40,000 in Hobart equipment in less than three months, Hobart was carrying four distributors in the area who sold less Hobart products than that during the entire year.

In sum, Hobart had the opportunity to establish a dealer relationship with a well financed, well managed and productive company capable by all reasonable criteria of producing quality sales for Hobart at a significant volume. The only hitch is that that dealer was in competition with Hobart's biggest customer in the area and the agreement between Hobart and Nobel had no purpose other than to prevent that competition.

The defendant correctly cites *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) for the proposition that an agreement between a manufacturer and a distributor to establish an exclusive distributorship is not unlawful under Section 1 of the Sherman Act. In advancing the argument defendant quotes from *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967) the following:

[a] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods.

These principles, however, are not applicable to the case at bar. As previously stated, the facts in this case have nothing whatever to do with an exclusive distributorship or a franchise. Further, though a conflict in the evidence exists, I am most persuaded by Mr. Ricca's expert testimony that much of Hobart's product line does not have equivalent brands available in the market. If a trader does not have access to Hobart equipment

at the same or approximate price as its competitors then the trader is excluded from the market, trade is restrained and the benefits of competition are impoverished.

From the foregoing, I conclude as follows:

1. The combination or conspiracy was the agreement between Nobel and Hobart that resulted from Nobel's 1974 threat.

2. The intent, purpose and objective of the combination or conspiracy was to eliminate or restrict Westman's ability to offer Nobel competition in: (a) the sale of Hobart equipment and (b) the furnishing of a "one-stop shopping" concern for kitchen equipment and supplies, by cutting off Westman's source of supply of Hobart kitchen equipment. The objective was, thus, solely to restrain trade.

3. The act done in furtherance of the conspiracy was Hobart's continuous refusal to make Westman a Hobart dealer or to sell its kitchen equipment to Westman during 1974, 1975 and after January 1, 1976.

4. The injury resulting from the act done in furtherance of the conspiracy was the loss of profits to Westman: (a) from direct sales of Hobart kitchen equipment which it was unable to make and (b) from sales of kitchen equipment and supplies lost because it could not make an underlying sale of Hobart kitchen equipment.

IT IS HEREBY ORDERED that this matter will be set for trial on the issue of damages at the earliest date convenient to the court and counsel. The injunction prayed for in the complaint shall be considered as soon as a draft thereof is submitted by plaintiff and defendant is afforded the opportunity to be heard with respect thereto.