TRI–R SYSTEMS, LIMITED, a Colorado Limited Partnership, Plaintiff,

v.

FRIEDMAN & SON, INC., a Colorado Corporation; Packaging Corporation of America, Inc., a Delaware Corporation; Southwest Forest Industries, Inc., a Nevada Corporation; and Tamko Asphalt Products, Inc. of Kansas, a Kansas Corporation, d/b/a Royal Brand Roofing, Defendants.

Civ. A. No. 79–K–1436.

United States District Court, D. Colorado.

July 30, 1981.

John F. Head, Head, Moye, Carver & Ray, Denver, Colo., for Tri–R Systems.

L. Richard Freese, Jr., Davis, Graham & Stubbs, Denver, Colo., for Packaging Corp.

Robert J. Kapelke, Gorsuch, Kirgis, Campbell, Walker & Grover, Sheldon E. Friedman, Isaacson, Rosenbaum, Speigleman & Friedman, P. C., Denver, Colo., for Friedman.

Harry L. Hobson, Holland & Hart, Denver, Colo., for Southwest Forest.

James E. Hautzinger, Robert E. Youle, Sherman & Howard, Denver, Colo., for Tamko.

## ORDER

KANE, District Judge.

This is an action for violation of sections one and two of the Sherman Act and section three of the Clayton Act. It is before me on motions for summary judgment by defendant Tamko Asphalt Products, Inc., of Kansas (Tamko) and defendant Packaging Corporation of America (PCA). Having reviewed the pleadings, briefs, affidavits and depositions submitted in support of these motions and mindful of the rarity of summary judgment in anti-trust cases I have concluded that there are genuine issues of fact in dispute and summary judgment would be inappropriate at this time.

■  Summary judgment should be entered only when the pleadings, depositions, affidavits and admissions filed show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 468, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). It is a drastic relief which must be applied with caution and the pleadings of the party opposing the motion are to be liberally construed, *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230 (10th Cir. 1975).

■  Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury. *Poller v. Columbia Broadcasting Co.*, 368 U.S. at 473, 82 S.Ct. at 491. *See also, Norfolk Monument Co. v. Woodlawn Memorial Gardens*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1193 (5th Cir. 1978).

■ Summary judgment is appropriate, however, when it is plain that the allegedly unlawful practice does not exist and plaintiff's claim is without merit. The mere allegation of a Sherman Act claim is not sufficient to withstand a motion for summary judgment once it has been rebutted, *Solomon v. Houston Corrugated Box Co.*, 526 F.2d 389 (5th Cir. 1976), and the facts are developed and legal issues clearly presented. *Nationwide Auto Appraiser Serv. Inc., v. Association of C&S Co.*, 382 F.2d 925, 929 (10th Cir. 1967). To survive a motion for summary judgment, however, the evidence must suggest reasonable inferences of conspiracy. *General Chemicals, Inc. v. Exxon Chemical Co. USA*, 625 F.2d 1231, 1233 (5th Cir. 1980). Here such an inference exists making summary judgment inappropriate.

■ Plaintiff alleges violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act. To establish a violation of § 1 [1] of the Sherman Act, plaintiff must show an unlawful restraint of trade in interstate commerce; a contract, combination, or conspiracy to attain it and damages therefrom. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 660, 81 S.Ct. 365, 367 (1961); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 516 (10th Cir. 1976). Section 2 [2] of the Sherman Act prohibits monopoly or an attempt to monopolize any part of interstate or foreign trade or commerce. This section is aimed *inter alia* at the acquisition or retention of effective market control. *United States v. Griffith*, 334 U.S. 100, 106–107, 68 S.Ct. 941, 945–946, 92 L.Ed. 1236 (1948).

Section 3 [3] of the Clayton Act requires a showing that there was an agreement or understanding between defendants that PCA and Tamko would only buy from Friedman and the effect of that agreement or understanding may be to lessen substantially competition or create a monopoly in a substantial share of the line of interstate commerce affected. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Dillon Materials Handling Inc. v. Albion Industries*, 567 F.2d 1299, 1302 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978).

Common to all of these claims is the element of a contract, combination, or conspiracy which restrains trade, forecloses competition or monopolizes a part of interstate commerce. PCA and Tamko base their motions for summary judgment on the lack of such a contract, combination or conspiracy. Thus the dispositive inquiry is whether there is a genuine issue as to the existence of a combination, contract or conspiracy between Friedman and Tamko or PCA.

The facts are long and convoluted, but a review of them is necessary in determining whether there has been a violation of the acts. All of the parties in this case are

---

1. 15 U.S.C. § 1 provides in pertinent part:
   Every contract, combination in the form of trust or otherwise or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared illegal....

2. 15 U.S.C. § 2 provides in pertinent part:
   Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, ....

3. 15 U.S.C. § 14 provides in pertinent part:
   It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, ..., for use, consumption or resale within the United States or any Territory thereof, ..., or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

involved in one way or another in the business of recycling waste paper. Plaintiff, Tri-R Systems, Limited (Tri-R) and defendant Friedman & Son, Inc., (Friedman) are in the business of buying four grades[4] of waste paper for recycling in the Denver metropolitan area and reselling it to mills in the western United States, and, in the case of Tri-R to Mexico. Tri-R alleges that Friedman enjoys a monopoly in the Denver area in all four grades.

The claim against PCA involves two grades of paper: mixed and corrugated. Tri-R's first claim for relief alleges conspiracy in violation of § 1 of the Sherman Act between Friedman and PCA whereby they agreed that PCA buy the above grades of paper in Denver exclusively from Friedman and not Friedman's competitor Tri-R. The second claim for relief alleges that Friedman has used its monopoly position in the Denver buying market to obtain PCA's agreement to refuse to buy corrugated and mixed paper from Tri-R and PCA acquiesced in this agreement, violating § 2 of the Sherman Act. Finally, the third claim for relief alleges a conspiracy between Friedman and PCA to create or maintain Friedman's monopoly in the Denver buying market, in violation of § 3 of the Clayton Act.

Tri-R was formed in 1977 by David Powelson, a discharged Friedman employee, for entry into the high grade and newspaper recycling business. Tri-R buys and sells waste paper in four grades from a number of sources, collects it at its plant and segregates it into various grades. It is then processed into bales and shipped to the purchaser.

Friedman is in the same business as Tri-R and has been in the business for many years. It has plants in Denver and Colorado Springs, Colorado; Tulsa and Oklahoma City, Oklahoma; Albuquerque, New Mexico, Wichita and Hutchinson, Kansas; and Salt Lake City, Utah. It is a closely held corporation under the direction of Marshall Friedman and Joe Goodman. In the Denver metropolitan area, Friedman enjoys a

monopoly in the waste paper recycling business. At the time Tri-R began operation, Friedman allegedly had 90% of the newspaper tonnage, 80% of the high grade tonnage and 98% of the mixed and corrugated tonnage.

Plaintiff alleges that after Tri-R began operations, Friedman initiated practices to put it out of business. These practices included hiring a private detective to observe Tri-R's business and its customers, obtaining information from railroad employees concerning the destination of Tri-R's rail cars, ordering its purchasing personnel to obtain and maintain customers whatever the price, and formulating a break-even analysis of Tri-R.

PCA is a user of mixed and corrugated paper which buys heavily out of the Denver market for its plant located in Denver. From mid-1977 to the commencement of this suit, virtually all of the paper purchased by PCA for its Denver plant came from Friedman.

The first contact between Tri-R and PCA occurred in late February 1978. Who initiated the initial contact is in dispute, but in any case Dick Cowan, PCA's purchasing agent visited Tri-R's plant. PCA was interested in buying high grade paper for its Hutchinson, Kansas mill. Powelson communicated Tri-R's need for a low grade market. Cowan replied that its Denver mill's supply for these grades was currently being filled by Friedman. PCA also maintains that at the time plaintiff had no low grades to sell.

The next attempt to sell mixed and corrugated to PCA occurred in the summer of 1978 when Powelson met John Pape, PCA's chief purchasing officer in Evanston, Illinois. Here there is conflicting testimony. PCA maintains that Pape told Powelson and Frost, a broker for Tri-R, that when the need for waste paper arose, including corrugated and mixed, PCA would consider Tri-R as an additional source. Tri-R maintains that when Powelson told Pape it needed an outlet for its mixed and corrugated

4. High grade, newspaper, corrugated, and mixed.

paper in Denver, Pape responded that PCA had an excellent relationship with Friedman, that if PCA bought from Tri-R it would only invite supply problems from Friedman, that PCA would not buy from Tri-R and Powelson should be patient until Joe Goodman was out of the picture.

The next contact between the two companies occurred in September of 1978 when Tri-R was awarded a one year contract for waste paper disposal from the federal center in Lakewood, Colorado. On this point there is considerable dispute. Plaintiff maintains that Friedman had previously been delivering the paper to PCA during business hours. The paper in question required certified destruction and thus had to remain under guard from the time it left government custody until it was destroyed. Plaintiff contacted Harry Hartman, PCA's Denver plant manager, in an attempt to sell the paper to PCA as Friedman had. Hartman allegedly called back to say that Tri-R would have to deliver the paper to PCA on a 24 hour, 7 days a week basis at PCA's convenience. In addition PCA would not pay for the paper. Because this was not feasible or economical, Tri-R was excused by the General Service Administration from performing the contract. However PCA maintains that Hartman had no authority to accept this offer and he had previously refused to accept federal center mixed from Friedman because of its high handling costs. Consequently, Hartman told Powelson he would not accept from Tri-R for the same reason. Thus there is considerable dispute on why PCA refused to process the federal paper.

The next contact between PCA and Tri-R occurred on February 28, 1979 when Powelson taped a phone conversation between himself and Cowan of PCA. Tri-R indicated that it needed an outlet for corrugated as well as the high grades it was already selling to PCA. However PCA responded that it was getting more than enough corrugated from Friedman and did not want to jeopardize or undercut its suppliers or foment competition among them.

The next attempt occurred in March, 1979 and here again there are conflicting stories. PCA maintains that it needed corrugated for its Denver mills and Andrew Waters, Cowan's superior, went in search of it. Cowan suggested Waters try Tri-R first, but Powelson had none to sell. Consequently, PCA purchased it from Friedman. PCA also maintains that it did purchase high grade waste paper from Tri-R and it did not meet high grade quality standards. Plaintiff maintains that when Waters stopped by the Tri-R plant Powelson pitched him on mixed and corrugated paper, told him Friedman had the Denver market sewed up and Friedman could not control the market without the cooperation of PCA. According to Powelson, Waters replied that it was not the way he personally did business and this attempt to sell mixed and corrugated paper failed.

PCA maintains that it called Tri-R for mixed paper in May, 1979, but Powelson said he had none. PCA also claims it called in July, 1979, but Powelson would not sell because of his decision to sue PCA. Tri-R maintains that the next attempt to sell mixed and corrugated paper to PCA occurred in October, 1979 when Cowan called looking for high grade paper. Powelson responded by asking PCA to buy mixed and corrugated paper, but PCA was not interested. Thus there are conflicting accounts of the events after March of 1979.

PCA maintains that each month PCA issues purchase orders to Friedman for tonnage needed for that month. Except for these orders, PCA maintains that no agreements existed between PCA and Friedman and specifically there is no exclusive dealing agreement between them. Nor, PCA maintains, did Friedman's employees attempt to coerce PCA into not dealing with Tri-R. Rather, PCA was simply satisfied with Friedman's service, quantity, quality, and prices.

Tamko owns and operates a felt mill and roofing plant, both of which are located in Phillipsburg, Kansas. Tamko purchases mixed and corrugated waste paper for processing in its felt mill into roofing material.

Tamko purchases its mixed and corrugated paper from a number of suppliers in cities in the midwest. In the Denver area that supplier is Friedman.

The first contact between Tri-R and Tamko took place in August or September of 1977. Matthew Kaynes, an employee of Tri-R called Tamko in an attempt to develop its market for mixed and corrugated. Tamko stated that it was not interested in purchasing paper from Tri-R. Tri-R maintains that the call was made to Don Harmonson at Tamko who later called back to say that Tamko could only buy from Friedman in Denver and it did not want to jeopardize its supply from Friedman in that market. Tamko maintains that Tri-R did not have a sufficient capacity to produce the volume of paper required by Tamko, although it is not clear whether this was communicated to Tri-R.

In June, 1978, Tri-R again attempted to sell to Tamko through Tri-R's Chicago broker, Consolidated Fibers, Inc. Tamko maintains that it informed Consolidated's representative that the company already had sufficient supplies from other sources, specifically Friedman, in the Denver market. Tamko also expressed concern to Consolidated that its supply from Friedman would be cut off. In a June 15, 1978 letter to Tamko, Consolidated offered to guarantee like tonnage if Friedman threatened to terminate Tamko's supply because it bought paper from Tri-R.

The next contact between the two companies took place in September of 1979. Tri-R maintains that it again attempted to sell low grade paper to Tamko and a Mr. Streit informed Powelson that he was not interested in purchasing from Tri-R because Friedman had been a major supplier to Tamko for years and they might cut off Tamko's supply if it did business with Tri-R. Mr. Streit does not recall this conversation and has testified that Tamko has never been threatened to be cut off by any of its suppliers.

Tamko maintains that on a regular basis it ships roofing material from its Phillipsburg plant to a distribution facility located in Denver. Rather than have its trucks return empty, Tamko purchases mixed and corrugated paper from Friedman's Denver plant. These purchases are made on an "as needed" basis and there is no written agreement between the parties. Further, Tamko has been satisfied with Friedman's service as well as the quantity, quality and price.

Plaintiff maintains otherwise. Tri-R contends that it would be a very desirable supplier for Tamko. Tri-R's plant is located less than one mile from Tamko's distribution facility in Denver, whereas Friedman's plants are located 5 to 15 miles away. Tamko has also expressed concern about Friedman forcing Tamko's trucks to return to Phillipsburg without a paper load. In addition, Tamko has complained about having to drive to Friedman's Englewood plant to obtain paper even though Friedman had the product at its north plant. Other Tamko complaints allegedly concern the quality of paper supplied and insufficient supplies to meet Tamko's requirements. Yet, Tamko has refused to buy from Tri-R.

■ Construing all of the evidence in a light most favorable to plaintiff, which I must on a motion for summary judgment, it is clear that there are genuine issues of fact as to whether there was an agreement between defendants not to sell to Tri-R. The agreement necessary to show a violation of the anti-trust laws does not have to be an explicit or formal one. *United States v. General Motors Corp.*, 384 U.S. 127, 142–3, 86 S.Ct. 1321, 1329–1330, 16 L.Ed.2d 415 (1966); *American Tobacco Co. v. United States*, 328 U.S. 781, 809, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *Theater Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Thus the essential combination or conspiracy in violation of the Sherman Act may be found in a

course of dealing or other circumstances as well as in any exchange of words. *American Tobacco Co. v. United States*, 328 U.S. at 809–810, 66 S.Ct. at 1138–1139.

 The combination or conspiracy may also be formed by acquiescence in the threats of another. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Albrecht v. The Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party and with that knowledge commits some act in furtherance thereof. This knowledge and participation may be inferred from the circumstances, acts and conduct of the parties. *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 973 (10th Cir. 1970).

To survive a motion for summary judgment, the evidence must suggest reasonable inferences of a conspiracy. *General Chemicals Co. v. Exxon Chemical Co. USA*, 625 F.2d at 1233. Here the evidence, although conflicting, when viewed in a light most favorable to plaintiff can suggest a conspiracy. It seems clear that Friedman has a major share of the market in the Denver area. It can be inferred from the evidence that Friedman used its position in the market to persuade or coerce its buyers not to buy certain grades of paper from plaintiff. While a unilateral refusal to deal is not necessarily evidence of a conspiracy, *see, United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), an anti-trust defendant cannot select customers where its conduct is for monopolistic or market control purposes. *See, Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 640 (10th Cir.), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973). In addition, I have held that a defendant who refuses to deal so that it will not jeopardize its relationship with its largest account violates the anti-trust laws. *Westman Comm'n Co. v. Hobart Corp.*, 461 F.Supp. 627 (D.Colo.1978). It can be inferred from the evidence that this took place here.

While plaintiff has not shown direct evidence of a specific agreement between defendants, such a showing is not necessary. *General Chemicals Co. v. Exxon Chemical Co. USA*, 625 F.2d at 1233. Rarely if ever can a plaintiff produce a smoking gun in cases such as this. *Id.* However plaintiff has presented evidence showing that defendants may have conspired against it. Plaintiff's case may ultimately fail, but it is not appropriate to deny plaintiff its day in court. Accordingly, it is

ORDERED that defendant Packaging Corporation of America and defendant Tamko Asphalt Products, Inc. of Kansas motions for summary judgment are hereby denied.