**WESTMAN COMMISSION COMPANY, Plaintiff,**

v.

**HOBART CORPORATION, Defendant.**

Civ. A. No. 76–K–918.

United States District Court, D. Colorado.

May 28, 1982.

Kenneth L. Starr, Ann Livedalen, Holmes & Starr, Michael J. Abramovitz, Drexler, Wald & Abramovitz, Denver, Colo., for plaintiff.

James E. Hautzinger, Robert E. Youle, Sherman & Howard, Denver, Colo., Thomas J. Collin, Thompson, Hine & Flory, Cleveland, Ohio, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER.

KANE, District Judge.

In this antitrust case the plaintiff, Westman Commission Company, alleges that the defendant, Hobart Corporation, combined or conspired with a competitor of the plaintiff, Nobel, Incorporated to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. sec. 1. Section 4 of the Clayton Act, 15 U.S.C. sec. 15, authorizes this private action and provides this court with subject-matter jurisdiction.

Pursuant to the pre-trial order, trial of this case was bifurcated. After the first trial, which was held in 1978 and was limited to the issue of the defendant's liability, I found that the defendant had violated section 1 of the Sherman Act, intending to eliminate or restrict the plaintiff's competition with Nobel. *Westman Commission Co. v. Hobart Corp.*, 461 F.Supp. 627 (D.Colo. 1978). After extensive discovery and other pre-trial proceedings, I held the second trial on the issue of the plaintiff's damages. Closing briefs have been filed and the matter is now ripe for decision.

## I. BACKGROUND

Without repeating my previous opinion in this case, I will summarize it. Hobart is a manufacturer of kitchen equipment for use in food service establishments. Its products include scales, refrigerators and freezers, cooking and reheating equipment, food preparation machines, dishwashing machines, disposers, and waste equipment systems. *Id.* at 628. Westman was in the wholesale grocery business from 1952 until 1973. In 1973 it purchased Wilscam Enterprises in order to expand the scope of its business to include the supplying of furnishings and kitchen equipment to its customers. By doing so it became a "one-stop shopping" center. *Id.* Nobel is also a "one-stop shopping" center for restaurant equipment and supplies. *Id.* at 629. Although Westman's and Nobel's trade areas are not coextensive, they are both centered in Denver, and they overlap to a large extent.

"One-stop shopping" has substantial benefits for a customer:

There is a recognized distinct market wherein a purveyor can supply a customer in the institutional food service or restaurant business with all requisite equipment and supplies. Commonly referred to as "one-stop shopping" or "full-line distribution," customers obtain convenience, cost savings and better service from a "one-stop shopping" distributor than from houses specializing in selected products.

*Id.* at 628. Of course, "one-stop shopping" also increases the supplier's sales to that customer. For a supplier that seeks to provide "one-stop shopping," a Hobart dealership is virtually essential, both because of that lack of adequate substitutes for Hobart equipment and because Hobart dealers obtain factory rebates of up to eight per cent of their purchases. *Id.* at 629.

There was considerable testimony at both trials on Westman's ability to "bootleg" Hobart equipment, that is, to buy it from a Hobart dealer and then resell it to the customer. I concluded at the first trial that bootlegging was usually not feasible.

> There is a general concensus, however, that there was no way that Westman could bootleg Hobart from another Hobart dealer and still be competitive. The president of Westman testified, "Nobel is our primary competitor; and if we can't buy at the same price as Nobel, there's no way we can compete with them." The inability to get eight per cent rebate affected the amount that an equipment dealer could bid. Furthermore, if Westman was to buy from an existing Hobart dealer, it had to pay that dealer an upcharge for supplying it with the equipment. Under these circumstances and in a market as competitive as the equipment supply business, McKinley's suggestion that Westman bootleg Hobart's products was totally unrealistic.

*Id.* at 634. As a bootlegger Westman would have also faced greater uncertainties in its supply of Hobart equipment. If, for example, it made a major contract bid assuming that it could get Hobart equipment at a certain price, it faced the risk that its profit margin could be extinguished because of higher prices from the dealer, or worse, that the dealer would refuse to supply the Hobart equipment that Westman had specified in the bid. Also, Westman would have placed itself in a precarious position if it had represented to its customers that it was in essence a Hobart dealer, but then could not obtain needed factory servicing for Hobart equipment that it had sold.

Summarizing the facts at the first trial, I concluded:

> Distilled to its essence the trial showed clearly that Westman was, in all respects, qualified to be a Hobart dealer; that Nobel was, and is, in a nonpareil marketing position as a "one-stop shopping" facility to the Denver region and that a Hobart dealership is essential to the successful operation of a "one-stop shopping" concern in the relevant market area. With equal or greater clarity the evidence showed that Nobel was, and is, Hobart's biggest customer in the Denver region and that McKinley, a new regional manager, did not want to do anything which in any way would jeopardize his relationship with his largest account. . . . That Nobel would not want the competition is understandable. That Hobart would not want to lose any of Nobel's business is obvious. That, because of Westman's capacity the two would conspire to keep Westman from becoming a successful "one-stop shopping" concern by denying it a Hobart dealership combines a unity of purpose with a common design and understanding which is illegal. The evidence fully supports the conclusion that Hobart engaged in a conspiracy in restraint of trade to the detriment of Westman and is therefore liable to Westman for damages.

*Id.* at 635–36. My final conclusion of law outlined what I believed to be a proper method of calculating damages:

> The injury resulting from the act done in furtherance of the conspiracy was the loss of profits to Westman: (a) from direct sales of Hobart kitchen equipment which it was unable to make and (b) from sales of kitchen equipment and supplies lost because it could not make an underlying sale of Hobart kitchen equipment.

*Id.* at 638.

At the first trial, both parties' attorneys demonstrated an excellent quality of advocacy, which facilitated the efficient determination of issues. See *id.* at 627–28. Unfortunately, the same was not thereafter

true.[1] The advocacy by attorneys for both sides after the first trial considerably exceeded zealous representation of clients' interests. The lawyering was marked by unnecessary obstruction and obfuscation. Counsel could have stipulated to a table of base data containing as many categories as necessary to preserve their different legal positions. Such a table would have then obviated many of the discovery battles that Magistrate Sickler had to endure in this case, and it would have allowed all counsel to devote more energy toward effective advocacy of their respective legal positions. It would have also allowed me to calculate the damages that I now award to the plaintiff with greater ease and precision. Countless discovery battles often made this case resemble an endurance contest more than a trial. Many of these involved minor or indisputable facts. All counsel could have engaged in more-effective advocacy had they focused their energies on the major issues of the case. At this juncture it is impossible for me to assess the blame for this sorry conduct, so I will defer resolution of that issue to the hearing on attorney fees, where I am sure that each party will seek to blame the other. Suffice it to say at this juncture that current criticism of the abuses of discovery and excessive costs of litigation is amply supported by the illustration of this case.

## II. CALCULATION OF WESTMAN'S DAMAGES

### A. Plaintiff's Theory

At the damages trial Westman offered a detailed study of its lost profits that was undertaken by Marvin L. Stone, a certified public accountant. In this study Stone first determined that Westman's competitive share of the Westman-Nobel market in Westman's trade area should be 33.13%.

He arrived at this figure by totaling Westman's and Nobel's purchases from common suppliers during 1977–79 for items that were to be sold in Westman's trade area. Next he determined Nobel's sales of Hobart and related equipment. These sales were in three categories: sales of Hobart equipment and sales of related non-Hobart equipment on contracts on which Nobel was the successful bidder, and noncontract sales of Hobart equipment. Assuming that Westman was completely barred from these types of sales, and assuming that Westman would have sold its competitive share of these items but for Hobart's illegal practices, Stone estimated what Westman's sales of Hobart and related equipment would have been if it had been a Hobart dealer. For this calculation Stone used the time period of June 26, 1974 through December 31, 1979.[2] Stone then applied Westman's gross profit percentage and variable cost percentage on equipment sales to determine Westman's lost profits from equipment sales, arriving at a figure of $296,166.[3]

Stone then estimated Westman's lost "follow-on" sales. Follow-on sales are the sales of supplies and additional equipment to customers who have already bought equipment from Westman on contract. Analyzing historical follow-on sales from contract sales and projecting the trends, Stone concluded that each dollar of contract sales led to 7.07 dollars (present value) of follow-on sales. He then applied this figure to all three categories of lost equipment sales to determine the total lost follow-on sales. Using the applicable gross-profit and variable-cost percentages, he then determined that Westman had lost profits of $1,529,142 from lost follow-on sales.[4]

Stone next considered Westman's lost profits for the period January 1, 1980 to December 31, 1984. He did this by calculat-

1. Some attorneys appeared at both trials. Others entered their appearances after the first trial.

2. June 26, 1974 is when Hobart first clearly indicated that it would not treat Westman as a Hobart dealer. See 461 F.Supp. at 631.

3. A table summarizing Westman's study of lost profits from equipment sales is attached as Appendix A.

4. A table summarizing Westman's study of lost profits from follow-on sales is attached as Appendix B.

ing the lost annual sales for the 1974–79 period and assuming that the lost annual sales in 1980–84 would be at the same rate.[5] Reducing the resultant lost profits to present value, using a 16.8% discount rate, he concluded that the future lost profits from equipment sales were $214,509 and the future lost profits from follow-on sales were $1,041,030.

### B. Defendant's Attacks

*Hobart did not offer any alternative study or theory on the calculation of Westman's damages.*[6] Instead, Hobart attempted to challenge Stone's study through vigorous cross-examination of him and by offering some alternative calculations based on his study.

Hobart first attacks Stone's damages study by arguing that Westman's alleged damages must be reduced by the amount of Hobart sales that Westman made during the study period. At trial Hobart introduced evidence that Westman had sold some Hobart equipment during the study period by "bootlegging" it from Buller Fixture Company, a Nebraska Hobart dealer. Hobart argues that Westman's claimed lost sales must be reduced by the amount of these actual sales.

Hobart next argues that Westman's claimed loss of sales of related non-Hobart equipment on contracts is overstated by 92%. Westman derived this figure from Nobel's sales of related equipment on contracts. Hobart argues that 92% of the contracts did not actually specify Hobart, and that the sales of related products should therefore be based only on the 8% of the contract sales that actually specified Hobart equipment. It then argues that, after reducing Westman's damages by this amount, Westman's actual sales of Hobart and related equipment are $1,541,327 more than its

actual damages. Perhaps magnanimously, Hobart has not counterclaimed for this amount.

In addition to arguing that Westman actually mitigated some or all of its damages by bootlegging, Hobart argues that Westman should have mitigated any remaining damages by further bootlegging from Buller. Additionally, Hobart argues that Westman did not mitigate its damages by filing for an injunction, as I suggested in my earlier order, see 461 F.Supp. at 638.

Hobart also argues that Westman has not proved its damages to sufficient certainty. In particular, it emphasizes that Westman has not offered any evidence of specific contracts or sales that it lost because it did not have a Hobart dealership. In support of this argument, Hobart submits several interrogatories that it sent to Westman, asking Westman to identify any specific sales or contracts that were lost because of Hobart's practices. After an extensive discovery battle Magistrate Sickler entered the answer "none" to each of these questions. Hobart now argues that this demonstrates Westman's failure to prove any specific damages and that this failure bars any recovery. To the extent my prior opinion on liability, which Hobart refers to as my "prior interlocutory order," found that Westman suffered any damages, Hobart seeks to have me amend that opinion.

Hobart's final argument is that any damages must be limited to the period ending on the date Westman filed its complaint.

### C. Damages Award in This Case

#### 1. Standard of Proof

■ In a private antitrust action the plaintiff must prove to a reasonable certainty[7] that the defendant's violation of the antitrust laws proximately caused the plain-

---

**5.** The end of 1984 was optimistically chosen as an estimate of the date when this case (including appeals) will finally be resolved.

**6.** At combined liability and damages trials in antitrust cases, especially those before juries, defendants are often hesitant to offer an alternative damage theory because doing so may be construed as a tacit admission of liability. See

L. Sullivan, *Antitrust* section 251 at 786 (1977). Such considerations were not, however, present in this case.

**7.** Although the appellate cases do not explicitly state what this standard is, I assume that it is the usual preponderance of the evidence standard.

tiff some damage. See section 4 of the Clayton Act, 15 U.S.C. section 15. However, once the plaintiff has demonstrated some damage, it need not prove the actual amount to the same degree of certainty.

> The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). See also *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242, 246 (10th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 958 (10th Cir. 1959); *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960).

■ Tacit in my liability opinion was the finding that Westman proved, by a preponderance of the evidence, that it suffered some damages as a direct result of Hobart's violation of section 1 of the Sherman Act, 15 U.S.C. section 1. Hobart now argues that I should reverse this finding. To do so, it relies on its own perverse damage "calculations" and on the assertion that Westman could have mitigated all of its damages. I reject this argument. There is no doubt that Hobart's illegal practices caused Westman some damages. By refusing Westman a dealership, Hobart clearly barred Westman from receiving the 8% factory rebates, and definitely caused Westman to lose some business that it would have otherwise had. Westman therefore has established all of the elements for a private action under section 4 of the Clayton Act, 15 U.S.C. section 15. What is left is to determine the amount of its damages.

As I noted before, once a plaintiff has established a *prima facie* antitrust case, he need not prove the actual amount of damages with exact precision.

> . . . the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as upon direct and positive proof.' Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946) (citations omitted). Accordingly, the Tenth Circuit recently stated,

> If the calculations upon which the loss of profits are based are estimated in any reasonable way and the underlying assumptions on which the accountant relied are not without support in the record, the calculations may be upheld as a valid means of measuring loss of profits.

*King & King Enterprises v. Champlin Petroleum Co.*, 657 F.2d 1147, 1158 (10th Cir. 1981) (citations omitted). A damage calculation may not, however, be "based on speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. at 264, 66 S.Ct. at 579. A trial court will therefore not award damages based on a hypothetical profit calculation that is unsupported by the evidence. *Denver Petroleum Corp. v. Shell Oil Co.*, 306 F.Supp. 289, 300, 309 (D.Colo. 1969).

■ Once a plaintiff has proved that the defendant's illegal conduct directly caused the plaintiff damage, it need not offer evidence of specific instances where it was damaged.[8] Its failure to do so may

---

**8.** As I noted earlier, Westman refused to answer several of Hobart's interrogatories, which sought to discover all of the specific contracts and sales that Westman lost because of Hobart's illegal acts. Throughout an extensive discovery battle, Westman refused to answer these questions, and instead responded that its damage study definitively demonstrated that it had lost many sales and contracts. Magistrate Sickler finally ordered that all of the interroga-

tories be deemed to be answered "none." Westman moved for reconsideration of this order.

Magistrate Sickler ruled properly. Although Westman certainly was entitled to rely on its damages study, it still was obligated to answer directly Hobart's interrogatories. However, because of my disposition of this issue, these answers are not relevant. They will be relevant in the hearing on attorney fees.

diminish the persuasiveness of a damage study but it will not repudiate the study. For example, in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 116 n. 11, 124–25, 89 S.Ct. 1562, 1573 n. 11, 1577, 23 L.Ed.2d 129 (1969), the court upheld in part a trial court award of antitrust damages that was based on the profits that the plaintiff lost because it was excluded from part of the market for its products by the defendant's illegal acts even though there was no evidence of specific lost sales.

■ When a defendant's illegal actions have excluded a plaintiff from part of the market in which it would have otherwise sold its products the defendant bears the risk of the uncertainty of accurately determining the plaintiff's damages. *Bigelow v. RKO Pictures, Inc.*, 327 U.S. at 265, 66 S.Ct. at 580; *Continental Baking Co. v. Old Homestead Bread Co.*, 476 F.2d 97, 111 (10th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 218 (1973). In the present case I must give Westman's damage study greater weight not only because Hobart's illegal actions caused Westman's damages, but also because Hobart did not offer any alternate theory, study, or evidence but attempted only to refute West-man's study. See *Greene v. General Foods Corp.*, 517 F.2d 635, 665 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *Eiberger v. Sony Corp. of America*, 459 F.Supp. 1276, 1286 (S.D.N.Y.1978), *aff'd in part, rev'd in part on other grounds*, 622 F.2d 1068 (2d Cir. 1980).

### 2. Mitigation: Bootlegging and Injunctive Relief

■ Hobart correctly argues that an "antitrust plaintiff has a duty to mitigate damages." *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 436 (5th Cir. 1977) (footnote omitted). If feasible and cost-effective, a plaintiff may even be obligated to buy the goods that it cannot purchase directly through a bootleg market. *Id.* However, as I found in the liability trial of this case, and as I noted earlier in this opinion, Westman could not buy bootlegged Hobart equipment for re-sale and still compete effectively with Nobel.[9]

■ Hobart's argument that Westman failed to mitigate its damages by not filing an injunction is ridiculous. This argument implicitly assumes that Hobart was guilty of a continuing violation of the antitrust

---

Hobart relies heavily on *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc.*, 527 F.2d 417, 419–20 (5th Cir. 1976), in support of its argument that Westman's failure to prove specific instances of damage is fatal to its case. That reliance is inappropriate because *Foremost* dealt solely with whether the plaintiff had proved that the defendant's illegal practices were a material cause of the plaintiff's damages, an issue that I have already resolved in favor of Westman. The other cases cited by Hobart also dealt with either lack of proof of causation or lack of sufficiently specific proof of damages and therefore are also inapposite.

9. Hobart asserts that Westman's president, Robert Weil, repudiated his testimony at the liability trial with his testimony at the damage trial. In particular, Hobart challenges my earlier conclusion:

> There is a general consensus, however, that there was no way that Westman could bootleg Hobart from another Hobart dealer and still be competitive. The president of Westman testified, 'Nobel is our primary competitor; and if we can't buy at the same price as Nobel, there's no way we can compete with them.' ... Under these circumstances and in a market as competitive as the equipment supply business, McKinley's suggestion that Westman bootleg Hobart's products was totally unrealistic.

416 F.Supp. at 634. Hobart argues that Weil refuted this finding when he testified that Westman occasionally bootlegged Hobart equipment, and successfully outbid Nobel on some contracts where some Hobart equipment was specified.

I reject Hobart's argument. Weil's statement that there was "no way" for Westman to compete with Nobel obviously contains some hyperbole, since Westman did compete successfully with Nobel on a few contracts. However, my basic conclusion that Westman is at a serious disadvantage competing with Nobel remains unchanged. The fact that Westman was able to compete despite some serious handicaps confirms my finding that it is completely qualified to be a Hobart dealer. Cf. *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 122–23, 89 S.Ct. 1562, 1575–76, 23 L.Ed.2d 129 (1969) (trial court could award plaintiff damages for lost profits from market exclusion, even though market exclusion was not totally effective).

laws, yet attempts to place the onus of stopping that violation on Westman. It is of course elementary that equitable relief such as injunction is not available when the plaintiff has an adequate remedy at law. The difficulty of accurately assessing damages diminished the adequacy of the legal remedy in this case, so I cannot say whether injunctive relief would have been proper had Westman requested it. However, in any event, a defendant can not claim immunity from damages caused by its illegal actions because a plaintiff could have stopped them by filing for an injunction.

### 3. Calculation of Lost Profits

#### a. Time Period

■ Westman filed its complaint in this case on September 16, 1976. The trial on damages ended on October 7, 1981, and the parties filed their closing briefs on December 4, 1981. Westman argues that Hobart's illegal practices began on July 26, 1974, the date when Hobart's agent decided not to recommend Westman as a Hobart dealer. See 461 F.Supp. at 631. Hobart does not dispute this starting date, but argues that damages should be limited to those accruing before September 16, 1976. Westman, on the other hand, seeks damages through December 31, 1984, its guess of when this case will be finally resolved. Its damages study estimated damages for the period July 26, 1974 through December 31, 1979. The later damages are claimed by extrapolating from this study.

In support of its argument that Westman's damages should be limited to those accrued before the complaint was filed, it cites three cases, *Borger v. Yamaha International Corp.*, 625 F.2d 390, 398, (2d Cir. 1980); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 394–96 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.*, 101 F.2d 79, 81 (2d Cir. 1939). All of these cases refused to allow awards for future damages because they would be too speculative. The earlier two, *Flintkote* and *Connecticut Importing*, held that no damages could be awarded for injuries that were caused by acts of the defendant after the suit was filed. The latest case, *Borger*, noted that, "in an appropriate case," damages could be awarded for those losses suffered up to the time of trial.

In the present case it would be ridiculous to limit damages to those accrued before the complaint was filed. At the 1981 damages trial the evidence clearly established that Hobart had still not granted Westman a dealership and that this violation of the Sherman Act was continuing to cause Westman damages. I therefore will calculate damages for the period July 26, 1974 through December 31, 1979 based on the evidence offered at trial. I will also pro-rate damages on a per diem basis up through the last day of trial, October 7, 1981. My damage calculation also includes profits that Westman will lose in the future because of Hobart's illegal practices before and up to the last day of trial. This approach is consistent with the U. S. Supreme Court's opinion in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).

... each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial.

(citations omitted).

#### b. Lost Equipment Sales

■ I reject both the plaintiff's and the defendant's damage calculations. Westman's theory improperly neglects the fact that Westman did in fact make some sales in spite of Hobart's illegal practices. Hobart's theory correctly points this out, but then fails to consider properly the entire market in calculating damages. I therefore will make my own determination of the profits that Westman lost because of Hobart's illegal practices. See *Eiberger v. Sony Corp. of America*, 459 F.Supp. 1276, 1287 (S.D.N.Y.1978), *aff'd in part, rev'd in part on other grounds*, 622 F.2d 1068 (2d Cir. 1980).

Because Nobel and Westman are the only "one-stop shopping" operations in the Denver area for institutional kitchen equipment and food products, I will analyze Westman's damages in terms of the Nobel-Westman market, and not consider the sales by other Hobart dealers. During the relevant time period and in the relevant trade area, Nobel's contract sales of Hobart equipment totaled $666,812. In the same period and area Westman's sales of Hobart Equipment totaled $132,579.[10] On total sales of $799,391, Westman's share was 16.6%.

Westman demonstrated that its competitive share of the Nobel-Westman market is 33.1%. It arrived at this figure by comparing Nobel's and Westman's purchases from 52 common suppliers. Hobart does not challenge this figure. It is in fact probably low, because without Hobart's illegal practices, Westman's purchases from these common suppliers would have been greater. However, using this conservative estimate, Westman was excluded from 16.5% of the market for contract sales of Hobart equipment. Cf. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 116 n. 11, 124–25, 89 S.Ct. 1562, 1573 n. 11, 1577, 23 L.Ed.2d 129 (1969) (upholding trial court's use of a similar lost profits/market exclusion calculation). See generally Anno., *Measure and Elements of Damages Under 15 U.S.C.S. section 15 Entitling Person Injured in his Business or Property by Reason of Anything Forbidden in Federal Antitrust Laws to Recover Treble Damages,* 16 A.L.R. Fed. 14, section 14(6) (1973). On total sales of $799,391, this 16.5% represents $131,900 of Hobart Contract Sales that Westman lost because of Hobart's illegal practices.

The next item that Westman claims is lost profits from sales of related non-Hobart equipment specified in contracts that included Hobart equipment. Westman argues that, during the relevant time period in the relevant trade area, Nobel made sales of $7,500,372 of related non-Hobart equipment on the contracts that included $666,812 of Hobart equipment. That is, for each dollar of Hobart equipment sold on contract Nobel sold 11.2 dollars of non-Hobart equipment on the same contract. Westman argues that it could have made similar sales, and therefore is entitled to the profits lost from these contract sales of related non-Hobart equipment.

Nobel challenges these claims. It points out that only 14 out of the 171 Nobel contracts that were the basis of the study actually specified Hobart equipment. It argues that Westman's lost sales of related non-Hobart equipment must therefore be reduced accordingly.

I reject Hobart's argument. In my opinion on the liability trial I detailed Hobart's unique position in the restaurant equipment business. 461 F.Supp. at 628. Given this unique position, it is unreasonable to assume that Westman could have successfully bid on more than a few of these 114 contracts without specifying Hobart equipment, even if Nobel's bid did not specifically require it. This conclusion is supported by the totally credible testimony of Westman's expert witness on food facilities design, Thomas Ricca:

Q: And is an equipment supplier such as Westman still at a disadvantage in competing with equipment suppliers such as Nobel as a result of not having a Hobart dealership?

A: I believe so.

Q: Would this be with respect to both jobs in which Hobart is specified by brand as well as those where it is not?

A: Yes.

10. At trial Westman's expert witness, Marvin Stone, calculated Westman's contract sales of Hobart equipment during 1976–1979 in the relevant trade area to be $83,227. Hobart urged that a larger figure, $111,862, should be used, but Stone properly rejected sales that were outside of the trade area and time period. The tabulations also indicate some contract sales of Hobart equipment in the trade area during 1975 and the applicable part of 1974. Westman's cost of these products was $44,064. The sales price is not indicated. Using the same markup as for the 1976–79 sales, 1.12, the sales price would have been $49,352. Westman's total contract sales therefore are $132,579.

Q: Would you explain the basis for that option.

A: Well, I believe in projects in which Hobart is specified by name, it's self-explanatory how they would be at a disadvantage. In other types of projects which are not specified by brand names, the unique position that Hobart enjoys in the acceptance frame of mind of end users would make it at least equally as necessary to have.

(RT 431–32, Oct. 7, 1981).

Using the multiplier of 11.2 on Westman's lost contract sales of Hobart equipment of $131,900, the lost sales of related equipment total $1,477,280. Cf. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 304–05 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (plaintiff may recover damages from lost camera sales that were directly caused by defendant's illegal practices in sale of flashcubes). Westman has therefore demonstrated that it lost $1,609,180 in contract sales because of Hobart's illegal practices.

Westman and Nobel also made non-contract sales of Hobart equipment. In the relevant trade area and time period, Nobel sold $2,049,409 of Hobart equipment on a non-contract basis and Westman sold $70,275.[11] Westman thus sold 3.3% of total sales of $2,119,684. Using 33.1% of the market as a conservative estimate of Westman's fair share, it was wrongfully deprived of 29.8% of $2,119,684 sales, for total lost non-contract sales of $631,666.

On both contract and non-contract sales, the parties agree that Westman's gross profit was 23.15% and its variable costs were 14.54%. Its net profit margin is thus 8.61%. Applying this to total lost sales of $2,240,846, I find that Westman's lost profit is $192,937.

*C. Lost Follow-on Sales*

In addition to claiming lost profits from sales of Hobart and related equipment, Westman also claims that it lost a substantial amount of "follow-on" sales. As I noted before, "one-stop shopping" is the common practice in the institutional food business. 461 F.Supp. at 629. Follow-on sales are the sales of food and supplies that follow a successful contract sale of restaurant equipment. Westman offered substantial evidence that it made large sales of food and supplies to institutions that had previously bought equipment on contract. Westman's expert, Marvin Stone, offered a detailed study of these follow-on sales. After reducing future sales to present value, utilizing a 16.8% discount rate, he concluded that each dollar of contract sales of equipment led on average to 7.07 dollars of follow-on sales. Although lost profits from follow-on sales account for a major portion of Westman's claimed damages, Hobart did not challenge this calculation, nor did it offer any alternate calculation.

Several courts have recognized lost follow-on sales in various contexts in antitrust cases. In *Greene v. General Foods Corp.*, 517 F.2d 635, 663–65 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) the plaintiff, a wholesale food distributor, claimed lost profits not only from lost sales of defendant's products, but also from lost sales of other food products. The appellate court upheld the trial court's award of damages based on the overall decline of plaintiff's business. The courts concluded that the sale of defendant's products had a "door opener" effect that caused customers to buy not only the defendant's products, but also other food products. The court in *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 447 F.Supp.

11. During 1976–79 Westman bought a total of $151,246 of Hobart equipment. Of this $100,578 was for contract sales, leaving $50,668 for non-contract sales. During 1975 and the relevant part of 1974 Westman bought $3,390 of Hobart equipment for resale on a non-contract basis. Its total cost of Hobart equipment for non-contract sales was therefore $54,058. Both parties agree that Westman's markup for such sales was 1.3, making $70,275 a reasonable estimate of the price it sold non-contract Hobart equipment for in the relevant time period and trade area.

**318**

867, 878 (S.D.N.Y.1978), *rev'd on other grounds*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979), recognized a similar "door opener" effect in finding that sugar refiner's illegal practices had caused injury to a sugar broker. In *Continental Distributing Co. v. Somerset Importers, Ltd.*, 411 F.Supp. 754, 757 (N.D.Ill.1976), the court recognized a "door opener" effect for the sales of certain quality liquors, and concluded that this effect was sufficient so that the plaintiffs would suffer irreparable injury if a preliminary injunction were not granted. Likewise, in *Skokie Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, No. 81 C 2406 (N.D.Ill. Dec. 14, 1981), the court recognized the "door opener" effect of defendant's quality liquors (see F.F. 22–24), but refused to grant a preliminary injunction on other grounds.

I have found two cases that refused to award damages stemming from lost follow-on sales. In *Frey & Son, Inc. v. Welch Grape Juice Co.*, 240 F. 114 (4th Cir. 1917), the court considered a food wholesaler who had attempted to sell the defendant's well-known grape juice at below the suggested price. The defendant did not stop selling to the wholesaler, but would only sell to him at the suggested price, eliminating any possible profit to him on the grape juice. While the court held that this action led to a cognizable claim for damages, it refused to allow the plaintiff damages for the incidental loss of business in other commodities. It found such losses to be "too remote and uncertain" and preventable by selling the grape juice without profit. *Id.* at 117–18. In *Velo-Bind, Inc. v. Minnesota Mining & Manufacturing Co.*, 647 F.2d 965, 972–74 (9th Cir.), *cert. denied*, ─── U.S. ───, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), the court

recognized plaintiff's claim for damages from defendant's patent infringement, but held that damages from follow-on sales were not recoverable.

In the present case, Westman has stated a sufficient claim for lost profits from follow-on sales. Like the cases involving well-known and widely distributed foods and drinks, this case involves the sale of equipment that is unequaled by any other equipment in the market. See 461 F.Supp. at 628. In contrast to the *Frey* case, Westman could not limit its damages by buying and selling Hobart equipment at the same price. Finally, *Velo-Bind* is distinguishable because it was a patent case. While a patent may give the holder a monopoly, the monopoly is limited in scope. An infringed-upon plaintiff therefore cannot claim all damages that proximately stem from an infringement, but instead may only claim those damages that were directly caused by the infringement. In contrast, antitrust laws are intended to make illegal all anti-competitive conduct, and therefore allow recovery for all damages proximately caused by violations, whether the cause is direct or indirect.

Westman's damage study concluded that every dollar of lost equipment sales led to 7.07 dollars of lost follow-on sales. However, some of the subsequent sales that went into this calculation were subsequent sales of equipment to the same business that bought the original equipment on contract. Because I have already calculated the lost equipment sales, it would be duplicative to include any lost equipment sales in the lost follow-on sales calculations. Accordingly, I reduce the follow-on multiplier of 7.07 by 17.6% to 5.83.[12]

---

**12.** Westman's expert accountant's work papers reveal that subsequent equipment sales and total subsequent sales were as follows:

| Contract Year | Subsequent Equipment Sales | Total Subsequent Sales |
|---|---|---|
| 1974 | $183,085 | $1,078,366 |
| 1975 | 226,067 | 1,064,866 |
| 1976 | 135,142 | 1,371,123 |
| 1977 | 170,446 | 876,656 |
| 1978 | 246,409 | 1,057,346 |
| total | $961,149 | $5,448,357 |

Subsequent equipment sales were therefore 17.6% of the total subsequent sales. Without re-doing Westman's complex damage study, I conclude that this is a reasonable estimate of the amount by which the follow-on sale multiplier should be reduced.

Applying this multiplier of 5.83 to lost contract sales of $1,609,180, I conclude that $9,381,519 is a reasonable estimate of the follow-on sales that Westman lost because of lost contract sales. On sales of these items Westman's gross profit was 20.79% and its variable costs were 14.54%. Its net profit on these items was thus 6.25%. Lost profits from lost follow-on sales therefore total $586,345.

Westman also claims damages by applying the same multiplier to lost follow-on sales after non-contract sales of Hobart equipment. While there were doubtless some such lost sales, it is inappropriate to use the same multiplier for non-contract sales as for contract sales because Westman and the customer would not have the same close relationship. Because the calculation of the follow-on multiplier is based solely on contract sales, I cannot determine what multiplier would be appropriate for non-contract sales. I therefore hold that Westman has not met its burden of providing a reasonable estimate of such damages.

### D. Total Lost Profits

In summary, I conclude that the following is a reasonable determination of Westman's proven damages for the period July 26, 1974 through December 31, 1979.

| | |
|---|---|
| lost contract sales of Hobart equipment | $ 131,900 |
| lost contract sales of related non-Hobart equipment | 1,477,280 |
| lost non-contract sales of Hobart equipment | 631,666 |
| **total lost equipment sales** | **$2,240,846** |
| lost follow-on sales from lost contract sales of equipment | 9,381,519 |
| lost profits: equipment sales (8.61% × $2,240,846) | $192,937 |
| follow-on sales (6.25% × $9,381,519) | 586,345 |
| **total lost profits** | **$ 779,282** |

The period July 26, 1974 through December 31, 1979 has 1985 days. Westman's *per diem* lost profits during this period were thus $392.59. The period January 1, 1980 through October 7, 1981 includes 646 days. A reasonable method of determining Westman's damages for this period is to apply the same *per diem* rate for lost profits of $253,613. Westman's lost profits through the last day of trial are therefore:

| | |
|---|---|
| lost profits (July 26, 1974 through December 31, 1979) | $ 779,282 |
| lost profits (January 1, 1980 through October 7, 1981) | 253,613 |
| **total lost profits** | **$1,032,895** |

13. Of course, the parties may be able to stipulate to a reasonable attorney fee. Considering the past conduct of the attorneys in this case, I doubt that they will. The parties should be

Section 4 of the Clayton Act, 15 U.S.C. section 15, requires me to treble these lost profits in making Westman's damage award. That trebled amount is $3,098,685. The same statute also requires me to award Westman a reasonable attorney fee, which I will do after the necessary hearing.[13] After awarding a reasonable attorney fee I shall certify the judgment for appeal pursuant to Rule 54(b) F.R.Civ.P.

### III. FUTURE DISPOSITION OF THIS CASE

At this time I do not know whether Hobart has finally offered Westman a dealership. If it has not then Westman's damages will continue to accumulate. At the appropriate time I will entertain a petition from Westman for additional damages. I will assess damages at the same *per diem* rate unless either party offers evidence of changed circumstances. Of course Westman's damages will stop accumulating whenever Hobart offers it a dealership.

Westman prayed for injunctive relief in its complaint, as authorized by section 16 of the Clayton Act, 15 U.S.C. section 26, and I stated in the liability opinion that I would consider injunctive relief if Westman requested it. 461 F.Supp. at 638. Westman so far has not moved for an injunction. Until it does, and the parties brief the issue, I cannot determine whether injunctive relief is appropriate. See generally Anno., *Propriety and Scope of Injunctive Relief in Federal Antitrust Case—Supreme Court Cases*, 55 L.Ed.2d 892 (1978).

IT IS ORDERED that judgment shall be entered in favor of the plaintiff and against the defendant in the amount of $3,098,685. It is further

ORDERED that, within 20 days of the date of this order, plaintiff shall submit a claim for a reasonable attorney fee and costs, as provided for by 15 U.S.C. section

governed by my attorney fee award in *Black Gold Ltd. v. Rockwool Industries, Inc.*, 529 F.Supp. 272 (D.Colo.1981).

320

15, together with any necessary supporting affidavits and other materials. The claim shall be submitted in a form which categorizes work performed. Such categories shall include: (a) pre-filing investigation, (b) pleadings, (c) discovery, (d) discovery disputes, (e) appearances before the magistrate, (f) appearances before the court outside of the trials, (g) investigation and interviewing witnesses, (h) time spent at the two trials, and (i) brief writing. Each category shall include sub-totals of time and computations using contemporary billing rates. Within 20 days after receipt of such claim, defendant shall file a response. Any necessary discovery on the issue of attorney fees shall be completed within this time period. It is further

ORDERED that this case shall remain open. Not earlier than four months after the date of this order, the plaintiff may petition this court for an award of damages for any continuing violation by the defendant of the antitrust laws. At any time the plaintiff may petition this court for injunctive relief.

## APPENDIX A

### LOST PROFITS ON SALES OF HOBART EQUIPMENT AND RELATED PRODUCTS FROM JULY 26, 1974 THROUGH DECEMBER 1979

| | | Supporting Schedule Reference | |
|---|---|---|---|
| A. | Nobel sales of Hobart equipment and related products: | | |
| | 1. Nobel contract sales of Hobart equipment | I | $ 666,812 |
| | 2. Nobel sales of related products in contracts which included Hobart equipment | I | 7,500,372 |
| | 3. Nobel noncontract sales of Hobart equipment | II | 2,049,409 |
| | 4. Total Nobel sales | – | $10,216,593 |
| B. | Westman's competitive share | III | 33.13% |
| C. | Westman's sales of Hobart equipment and related products if it had been a Hobart dealer (item A. times item B.) | – | $ 3,384,757 |
| D. | Westman's gross profit percentage on sales of equipment and related products | IV | 23.15% |
| E. | Westman's gross profit on sales of Hobart equipment and related products if it had been a Hobart dealer (item C. times item D.) | – | 783,571 |
| F. | Variable costs: | | |
| | 1. Sales (item C.) | – | 3,384,757 |
| | 2. Westman's variable cost percentage | V | 14.40% |
| | 3. Variable costs (item 1. times item 2.) | – | 487,405 |
| G. | Lost profits on sales of Hobart equipment and related products from July 26, 1974 through December 1979 (item E. minus item F.3.) | – | $ 296,166 |

## APPENDIX B

### LOST PROFITS ON FOLLOW–ON SALES ASSOCIATED WITH SALES OF HOBART EQUIPMENT AND RELATED PRODUCTS FROM JULY 26, 1974 THROUGH DECEMBER 1979

|  |  | Supporting Schedule Reference |  |
|---|---|---|---|
| A. | *Westman's sales of Hobart equipment and related products if it had been a Hobart dealer* (Schedule A, item C.) | – | $ 3,384,757 |
| B. | *Westman's ratio of follow-on sales* | $VII_1$ | 7.07 |
| C. | *Lost follow-on sales* (item A. times item B.) | – | 23,930,231 |
| D. | *Westman's gross profit percentage* | VI | 20.79% |
| E. | *Westman's gross profit on follow-on sales* (item C. times item D.) | – | 4,975,095 |
| F. | *Variable costs:* |  |  |
|  | 1. Lost follow-on sales (item C.) | – | 23,930,231 |
|  | 2. Westman's variable cost percentage | V | 14.40% |
|  | 3. Variable costs (item 1. times item 2.) | – | 3,445,953 |
| G. | *Lost profits on follow-on sales associated with sales of Hobart equipment and related products from July 26, 1974 through December 1979* (item E. minus item F.3.) | – | $ 1,529,142 |